## THE LIGHTER NO. 14.

### MILLARD et al. v. THE LIGHTER NO. 14.

#### (District Court, S. D. New York. December 1, 1892 )

SALVAGE—TUG—PUMPING ON FIRE —INTERFERENCE BY FIRE DEPARTMENT.

A tug was summoned to the assistance of a burning lighter, and began playing water on the fire. An engine of the city fire department came about the same time, and soon after a city fire boat. At about the time of the latter's arrival, the foreman of the fire department ordered the tug to stop pumping and to go away. She stopped pumping, but remained alongside of the lighter, and was afterwards used by the department as a landing to work on the lighter. Afterwards the department, finding itself unable to extinguish the fire, ordered the lighter filled and sunk, whereupon the tug again assisted in pumping. The time of the tug's service was about three hours, though her actual pumping service was much less, owing to the action of the department. The value of the property saved was about $25,000. *Held*, that the prompt response of the tug and her assistance should not be allowed to suffer disparagement through the arbitrary ill-judged, and erroneous action of the fire department in interrupting her service. Four hundred dollars was therefore awarded as salvage.

In Admiralty. Libel for salvage.

Wilcox, Adams & Green, for libelants.
Carpenter & Mosher, for claimants.

BROWN, District Judge. At about half past 12 o'clock on the morning of July 21, 1892, a fire broke out on the lighter No. 14, loaded with cargo, and lying on the south side of pier 2 at Prentiss' stores at the foot of Joralemon street, Brooklyn. The fire was almost immediately noticed by the mate of the libelants' tug America, which was lying with her steam up and crew aboard, nearly opposite at pier 13, East river, New York, and was well provided with appliances for extinguishing fire. Attracted by the continuous sound of the whistle given by No. 14 as a signal for assistance, the America crossed at once, preparing her hose pipe and nozzle on the way. Coming alongside the lighter, she immediately commenced playing her hose through the after manhole upon the fire below. An engine

belonging to the fire department of Brooklyn arrived at about the same time. For a few minutes before, there had been a small and weak stream thrown down the companion way by the watchman on the dock, who had connected a hose with the dock hydrant. The fire boat Seth Low also came in shortly after the America, and took a position across the bow of the lighter, from which she operated with her hose. About the time that the Seth Low came, or shortly after, the foreman of the fire department, finding that the America's hose was not from a fire department boat, ordered it shut off, and that the America should remove from the lighter, threatening to cut her hose and lines if this order was not obeyed. The hose was accordingly removed to the America; but she remained alongside the lighter.

Afterwards the fire department finding itself unable to extinguish the fire, made use of the America as a landing from which to burst open the door in the gangway on the outer or starboard side of the lighter, in order to remove to the America some of the cargo which blocked up the lighter, and thus open up a more direct approach to the fire. The same was also done on the port side. Being still unable, however, to extinguish the fire, the department finally ordered that the lighter be filled with water and sunk; whereupon the America's hose was again used in pumping in water for a time, until the lighter began to settle down, when she drew away. The lighter soon after sank and the fire was thus extinguished. Most of the cargo that was at first put upon the America was put back upon the lighter before she sank, under orders of the fire department. A few packages of lard remained on the America, which were afterwards delivered to the owners. The value of the barge was $35,000 and of the cargo $20,000. The value saved was, of the barge, $17,000; of the cargo, $8,000.

It is to be regretted that there should be any such jealousies between the fire department on land and tugs rendering assistance on the water, as should interfere with the speediest possible relief to vessels in flames. Cases before me are not infrequent in which, under threats of violence, tugs rendering assistance are ordered to desist by the fire department on shore, under its claim of exclusive control; and this, not because the help of the tugs may not be timely and useful, but from an arbitrary assumption of control of the matter by the department. It would be a great misfortune if, through liability to such interference and exclusion, tugs having efficient appliances for extinguishing fires about the slips or docks, should become less prompt, as would be likely, to go to the relief of vessels on fire with all possible speed. The first moments are the most important of all. Cases are frequent when the tugs are not only more quickly on the ground, but are better able to get at the fire; and emergencies often arise, requiring the removal of the vessel aflame, or of other vessels threatened with danger, in which the fire department can do little or nothing. Common interest and the public safety, therefore, require that all due encouragements be maintained for the most prompt and efficient assistance in cases of fire on the water, from the tugs of the harbor, as well as from the fire department. Both ought to co-operate, without unnecessary interference from each

other. If in the cases of vessels moored to the land, the fire department and police may assume control so far as to prevent disorder or inefficient work, this power does not rightfully extend to the exclusion of efficient help from tugs previously engaged. In this court, therefore, where a tug has proceeded with dispatch to the scene of the fire, upon a recognized signal for help from tugs, as in this case, and has rendered valuable assistance, her claim to salvage will not be allowed to suffer disparagement, through any arbitrary and improper interference by the fire department, which prevented an uninterrupted continuance of her aid until completion of the salvage work.

In the present case, the event shows that the action of the fire department was not only arbitrary, but grossly ill judged and erroneous; and that both the lighter and her cargo have suffered from the unwarrantable interference and threats which caused the America for a time to suspend playing with her hose. Her work did not in the least interfere with the work of the fire department. The event was unfortunate. The fire department could not put out the fire without finally sinking the lighter, whereby less than half the value of the vessel and cargo was saved. The work was a continuous one from the time the America arrived. She is entitled to at least her proportion of the whole salvage work considered as one undertaking. See The Henry K. Tilton, 53 Fed. Rep. 139. She was more or less occupied on the work for about three hours, though the actual playing of her hose was, through the interference of the fire department, much less than that. But she responded with alacrity to the lighter's signal, and her claim is meritorious. I award her $400. Of this amount, two thirds will go to the owners; and of the remaining third, $25 is allowed to the mate or pilot, who was in charge, and the residue to the mate and other men on board of the America in proportion to their wages.

Decree accordingly, with costs.